# United States Court of Appeals
## For the First Circuit

No. 03-1801

GAIL ZYLA,

Plaintiff, Appellant,

v.

WADSWORTH, a Division of the Thomson Corporation,
the THOMSON CORPORATION, and MARIE BOYLE STRUBLE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Boudin, Chief Judge,
Lynch and Lipez, Circuit Judges.

David J. Fine, with whom Zick Rubin was on brief, for
appellant.

Joshua M. Rubins, with whom Daniel J. Kelly, James F.
Rittinger, and Satterlee Stephens Burke & Burke LLP were on brief,
for appellees.

February 25, 2004

**LYNCH**, **Circuit Judge**.  This civil case arose out of a dispute over authorship of the fourth edition of a college textbook, Personal Nutrition, published in August 2000.

Gail Zyla was a visiting lecturer in nutrition at Tufts University from 1996 until 2000, when she became an independent writer.  Earlier in the 1990s, she had worked with Professor Marie Boyle Struble, a professor and director of the graduate program in nutrition at The College of St. Elizabeth, on the second and third editions of the textbook.  Both were listed as co-authors; Struble had co-authored the first edition with someone else in 1989 and was the lead author on all three editions.

In 2001, Zyla sued Struble, her publisher (Thomson Corporation), and the division of Thomson that published the textbook (Wadsworth) over the publication of the fourth edition.[1] Zyla was unhappy that, in late 1998, Thomson had extended the authors' original deadline for submission of materials, as well as the publication date for the fourth edition, in order to accommodate Struble's busy schedule, instead of adopting Zyla's proposal to give Zyla a greater share of the work and of the royalties if the deadline were missed again.  Zyla withdrew from the project in 1999 and notified Thomson and Struble that they had

---

[1]     Because the claims and factual allegations that Zyla raises against Wadsworth are identical to those she raises against Thomson, we refer to the two defendants collectively as "Thomson," for clarity and convenience.

no permission to use any of the work she had done to date for the fourth edition.  Only when the book was published, she said, did she learn that her work had been used in the fourth edition without her permission and without appropriate attribution.[2]   Zyla continued to receive 12.5% of the total royalties on the Fourth Edition (her residuals from earlier editions), but not the 40% she would have received had she not withdrawn as an author.

Zyla's suit in federal court sought damages and royalties, asserting seven causes of action: (1) copyright infringement; (2) violation of the Lanham Act, 15 U.S.C. § 1125(a); (3) breach of contract by Struble; (4) breach of contract by Thomson; (5) a petition for a declaration voiding an agreement signed by Zyla that reduced the royalties to which she was entitled for the fourth edition to 12.5%; (6) intentional interference with advantageous relations by Struble; and (7) violation of Mass. Gen. Laws Ann. ch. 93A, §§ 2 and 11.  After discovery, the district court entered summary judgment for defendants on all claims.  Zyla appeals.  We affirm.

**I.**

---

[2]     The defendants replied below and on appeal that any overlap between Zyla's proposed revisions and the fourth edition was inadvertent and de minimis and involved mostly material in the public domain published by the government.

The facts are described in the light most favorable to Zyla, the non-moving party. Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000).

Personal Nutrition is an undergraduate textbook published originally by West Publishing, and later by its successor, Thomson. The first edition of the textbook was published in 1989. Struble and Eleanor Whitney were the co-authors, with Struble acting as lead author. When Whitney chose not to work on the second edition, Zyla was brought in to replace her as co-author on that edition. Although Zyla did not have the college teaching experience, academic affiliation, or doctoral degree usually preferred for textbook authors, the editor believed that she could handle the job because she was an experienced writer in the field of nutrition. The second edition was published in 1992.

On January 26, 1995, West entered into an agreement with Struble and Zyla (who are referred to jointly as "Author" in the contract) to prepare the third edition. This agreement (the "Third Edition Agreement") stated that it was to be governed by Minnesota law. It provided for the authors to receive a combined royalty of 15 percent of net paid sales. Zyla was to receive 25 percent of this total, while Struble was to receive 68.43 percent.[3] Section 2 of the agreement provided that:

_____

[3] The remainder was divided between Eleanor Whitney and ESHA Research.

-4-

> If the contribution of any one or more Authors is not delivered to West on or before the Due Date or West determines that the contribution will not be so delivered . . . , West may, after consultation with the Authors, terminate this Agreement with respect to the non-performing Author(s) and continue this Agreement with the remaining Author(s) alone or with one or more mutually acceptable co-authors, or terminate this Agreement.

Section 7 provided that if an author did not participate in subsequent revised editions of the book,

> Author . . . will be paid one-half of Author's compensation [under the third edition] with respect to the first revised edition in which Author does not participate and one-quarter of such compensation with respect to the second revised edition in which Author does not participate.

The Third Edition Agreement also contained an assignment of copyright in Section 3, which provided that:

> Author hereby assigns and transfers to West all present and future copyrights and other rights in the Work (including revised editions of the Work) and supplements thereto.

The "Work" was defined in Section 1.1 as the third edition of Personal Nutrition.

The third edition was published by West in 1996. Afterwards, Thomson succeeded to West's rights and obligations under the Third Edition Agreement.

Between late August and early September 1997, Thomson, Struble, and Zyla signed an addendum to the Third Edition Agreement to cover the fourth edition (the "Fourth Edition Addendum"). The addendum changed the royalties allocation provision in the Third Edition Agreement to give 60% to Struble and 40% to Zyla for the

-5-

fourth edition.  It stated that "[s]hould the responsibilities of the Authors change during the writing of the revision, the royalties can be adjusted accordingly upon written receipt [by] the Publisher of a letter from the Authors signed by both Authors reallocating the royalties."  The addendum also set a manuscript deadline of March 1, 1998, and stated that if this deadline was not met, "the Publisher may terminate this Agreement or Addendum."

In October 1997, Walter Marshall, the editor whom Thomson assigned to work on the textbook, became concerned that Struble was behind in her work and suggested that she turn over some of her work to Zyla to enable the two authors to meet the March 1 deadline.  Struble declined to do so.  By early 1998, it became clear that the authors would not make the deadline.  Zyla had submitted revisions for two of her four assigned chapters and two of the eleven "Nutrition Action" features that she was to write, and Struble had sent a new feature entitled "The Savvy Diner" but no revisions for her seven assigned chapters.

Thomson chose not to exercise its power under Section 2 of the Third Edition Agreement to terminate the agreement with either author.  Instead, in late 1998, Marshall extended the deadline until April 1, 1999, and then until May 15, 1999.  The parties dispute the motivation for this move, but the dispute may be more apparent than real.  Zyla points to a letter from Struble to Thomson's in-house counsel, Ken Carson, that stated that the

fourth edition was "placed on hold so that Marie Boyle [Struble] could first revise her other text -- Community Nutrition with Diane Morris." Marshall admitted in his affidavit that he wanted Struble to finish Community Nutrition first, but said that he wanted Struble to do so because Community Nutrition was further along and he believed that Struble worked more effectively when concentrating on one project at a time. He claimed that his first priority in extending the deadline was to promote Personal Nutrition, which had greater revenue value than Community Nutrition. In addition, he stated that he also based his decision on the belief that author tardiness was "often manageable" and on his experience working with Struble, who had previously missed internal deadlines because of deaths in her family but had been able to catch up with the final schedule.

Zyla told Marshall that she would agree to the new deadline, provided that more of the work and royalties would be assigned to her if Struble again failed to meet the deadline. Marshall and Struble refused. Marshall stated in his affidavit that he refused because he was concerned that a reallocation would lead Struble to withdraw from the project. He believed the participation of Struble was critical to the book's success, at least in part because she had been the lead author of the first edition.

Zyla then wrote a letter to Marshall on April 12, 1999, stating that she would not participate further in the fourth edition and that the revisions that she had submitted to Struble and Thomson could not be used without her permission. Sixteen days later, on April 28, Marshall sent Zyla a letter informing her that Struble had finished the fourth edition and was about to send it for publication. The letter asked Zyla to sign an agreement, dated April 10, 2000, indicating her acknowledgment that as agreed under Section 7 of the Third Edition Agreement, she would receive 12.5% of the author royalties from the fourth edition. Zyla signed the agreement (the "April 10 Agreement").

The fourth edition was published in August 2000, with Struble listed as the sole author. Zyla bought a copy in February 2001 and says that she discovered then, to her surprise, that the fourth edition copied (1) her line edits to chapters one and two; (2) her definitions of terms used in those chapters; (3) a section that she had written on dietary reference intakes; (4) her revisions to the "Nutrition Action" sections of chapters one and four; (5) her drawing of a shopping cart; and (6) her caption for a photograph. Zyla received a copyright registration in those materials two months later, on April 6, 2001. In her registration application, she described the materials as a derivative work of the third edition. After obtaining the registration, Zyla called

-8-

and wrote to Thomson and Struble, telling them that they had infringed her copyright.

Zyla was also displeased with the acknowledgments section to the fourth edition, which contained a statement that "I [Struble] am grateful for the work that Gail Zyla contributed to the second and third editions of this text; her insights are reflected in this new edition, still." Zyla felt that this statement falsely implied that she had made no contribution to the fourth edition.

On August 23, 2001, Zyla brought suit in federal district court against Thomson and Struble seeking injunctive relief and damages. The defendants moved for summary judgment, arguing principally that they had not violated any copyright held by Zyla because any copying was de minimis, that Zyla had not shown any actual confusion from the acknowledgments section, and that Thomson had no obligation to terminate the agreement with Struble. They also argued that Zyla had already received money exceeding the amount that any reasonable jury could award in damages. Thomson had given Zyla $2,000.00 to defray her expenses in preparing the fourth edition. She spent approximately $265.00 and never returned the remainder.

The district court granted summary judgment for the defendants on all claims. The court found that Zyla had assigned any copyright in the revisions for the fourth edition to Thomson

under the Third Edition Agreement and that the Lanham Act did not apply because no trademark was at issue.  Applying Minnesota law to the breach of contract claims, the court held that no contract was formed between Struble and Zyla and that Thomson was not in breach of the contract because Section 2 of the Third Edition Agreement provided that Thomson "may" terminate a contract with an author who fails to meet a deadline but imposed no obligation on Thomson to do so.  The court rejected Zyla's petition for a declaration voiding the April 10 Agreement because the court found that even if that agreement had somehow been fraudulently obtained, it merely reiterated the terms of Section 7 of the Third Edition Agreement, which Zyla had not alleged was obtained fraudulently.  The court also rejected Zyla's claim that Struble intentionally interfered with advantageous business relations by refusing to allot Zyla more of the royalties and work, concluding that Struble's actions did not have the effect of interfering with any existing contractual relationship.  Finally, the court found that Zyla's Mass. Gen. Laws Ann. ch. 93A claim failed because the claims upon which it was based -- breach of contract, tortious interference, and fraud -- had already been rejected.

The district court also denied motions by Zyla to amend her complaint to add a claim for punitive damages and to impose sanctions on the defendants for discovery misconduct.

Zyla appeals from the grant of summary judgment and the denial of those motions.  We consider each of her claims in turn.

## II.

A.  Copyright Claim[4]

The district court, construing the Third Edition Agreement and the Fourth Edition Addendum, correctly held that Thomson was the sole owner of all copyright interests in the fourth edition.

Zyla cannot claim a copyright interest in her purported revisions.  It is undisputed that under the Third Edition Agreement, Zyla "assign[ed] . . . all present and future copyrights in the [third edition (including revised editions of the [third edition])" to Thomson.  By Zyla's own admission in her April 2001 copyright registration application, her revisions are a derivative work based on, and pervasively incorporating pre-existing material from, the third edition.  Only Thomson, which is the sole owner of the third edition, may claim a copyright interest in such derivative works.  See 17 U.S.C. § 106(2); Gracen v. Bradford Exchange, 698 F.2d 300, 302 (7th Cir. 1983) ("Since the copyright owner's bundle of exclusive rights includes the right to prepare derivative works based upon the copyrighted work, . . . [the

---

[4]     We note that no party asserts that this case involves a work for hire agreement.  See Cleary v. News Corp., 30 F.3d 1255, 1259-60 (9th Cir. 1994).

-11-

creator of the derivative work] could not copyright them" without permission to incorporate the pre-existing material).[5]

Furthermore, even if Zyla could claim a copyright interest in her revisions, she assigned that interest to Thomson as well. The Third Edition Agreement assigns to Thomson all copyright interests in the fourth edition, as a "revised edition[]" of the third edition. Given that the authors of standard textbooks frequently change over time (as this case illustrates, as Zyla was not involved in the first edition), this allocation of copyright interests to the publisher reflects commercial realities.

Zyla argues, however, that it is ambiguous whether this assignment includes revisions incorporated into the fourth edition without her authorization, and that under Minnesota law, which governs the interpretation of the Third Edition Agreement, ambiguities must be construed against Thomson as the drafting party. Current Tech. Concepts v. Irie Enters., 530 N.W.2d 539, 543 (Minn. 1995). We see no such ambiguity. The assignment provision contains no such limitation.

Zyla also argues that the fact that she informed Thomson in April 1999 that it was not to use her work on the fourth edition deprived Thomson of any copyright interest. But neither the Third

_____

[5] The fact that Zyla registered a copyright in those revisions does not undermine this conclusion. Although registration creates a presumption of validity, that presumption is rebuttable. Lotus Dev. Corp. v. Borland Int'l, 49 F.3d 807, 813 (1st Cir. 1995).

-12-

Edition Agreement nor any communication by Thomson in response to Zyla's letter indicated an abandonment of Thomson's copyright.

Zyla makes a last argument that regardless of the contract language, the parties' course of performance confirmed her ownership of a copyright in her work for the fourth edition. She bases this argument largely on the fact that Marshall, the editor whom Thomson assigned to work on the textbook, took the position that if Struble did some improper copying, then Struble should compensate Zyla, and that Marshall did not say then that Zyla had no copyright interest in the materials. This argument mixes apples and artichokes. A publisher's pragmatic attempt to solve a problem between two authors, neither of whom owns the copyright in the published work, is not an abandonment of its own copyright interest.[6]

Dismissal of Zyla's copyright claim was appropriate.

B. Lanham Act

Zyla claimed a violation § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), based on her contention that the acknowledgments section of the fourth edition falsely credited Struble with

---

[6] Zyla also argues that because the defendants did not advance the contract interpretation argument to the district court, the argument should be rejected. The district court nonetheless reached the argument, and Zyla has had a fair opportunity to address it with us. In addition, Zyla argues that Thomson's failure to advance the contract interpretation argument demonstrates that it has no copyright interest. This argument confuses court rules on forfeiture of arguments with substantive rules of abandonment of copyrights.

authorship to Zyla's detriment. Zyla's argument sets up a quandary, of course. Zyla expressly withdrew from the fourth edition, so crediting her with authorship would have itself created a possible false attribution claim.

The district court dismissed the Lanham Act claim, essentially for failure to state a claim. Zyla correctly argues that § 43(a)(1) is not limited to the protection of trademark holders. The existence of a trademark is not a necessary prerequisite to a § 43(a) action. See Dastar Corp. v. Twentieth Century Fox Film Corp., 123 S. Ct. 2041, 2045 (2003) ("While much of the Lanham Act addresses the registration, use, and infringement of trademarks and related marks, § 43(a), 15 U.S.C. § 1125(a) is one of the few provisions that goes beyond trademark protection.").

Section 43(a)(1), as it stands after the 1988 amendments, reads as follows:

Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

-14-

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Zyla's claim, as we understand it, is that the acknowledgments section "is likely to cause confusion . . . as to the origin . . . of . . . goods." Although Zyla admits that Struble was the lead author of the fourth edition, she argues that the acknowledgments section made an implicit representation that none (or at least very little) of the new work in that edition was Zyla's, when in fact, according to Zyla, significant portions of the fourth edition copied her original work.[7]

The Supreme Court has determined, however, that § 43(a)(1)(A) does not apply to the type of claim that Zyla raises. In Dastar Corp. v. Twentieth Century Fox, the plaintiffs had contracted for exclusive rights to manufacture and distribute videos of "Crusade in Europe," a television series about World War II. 123 S. Ct. at 2044. (The copyright in the original television series had expired.) When Dastar released a video set based on the "Crusade" series, which was now in the public domain, without giving credit to the plaintiffs, they sued under § 43(a)(1)(A), claiming false designation of origin. Id. The Court rejected the

---

[7]    This is not a claim that Zyla's work was substantially changed and altered by Thomson without her permission. See, e.g., Choe v. Fordham Univ. Sch. of Law, 920 F. Supp. 44, 47 (S.D.N.Y. 1995), aff'd 81 F.3d 319 (2d Cir. 1996); Gilliam v. Am. Broad. Co., 538 F.2d 14, 24 (2d Cir. 1976). Nor is this an assertion that Zyla's own name constituted a service mark. See, e.g., Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 216-19 (2d Cir. 2003).

plaintiffs' claim, holding that the term "origin" applies only to "the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." Id. at 2050. The Court found that no false designation of origin had occurred because Dastar accurately identified itself as the manufacturer of the physical video, even if it had not accurately credited others for the creative content of the video. Id. Claims of false authorship, the Court reasoned, should be pursued under copyright law instead. Id. at 2048-49. We conclude that Dastar controls here and bars Zyla's Lanham Act claim.[8]

C. Breach of Contract

The Third Edition Agreement provided that Minnesota law applies to the contract. The district court's application of that law and its conclusions were correct.

1. Contract Claim Against Struble

The district court correctly dismissed the contract claim against Struble, Zyla's co-author, on the basis that the Agreement created no contract between Zyla and Struble. Zyla incorrectly argues that the district court "missed the point." The point, she

---

[8] The Court in Dastar left open the possibility that some false authorship claims could be vindicated under the auspices of § 43(a)(1)(B)'s prohibition on false advertising. See 123 S. Ct. at 2050. But to make out such a claim, Zyla must show that the acknowledgments section was a form of "commercial advertising or promotion," and she has not alleged the facts necessary to support that conclusion.

says, is that "every contract" under Minnesota law "includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract." In re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn. 1995) (internal quotation marks omitted). But there was no contractual relation running between Struble and Zyla. Under Minnesota law, the existence of a contract is a prerequisite to the implied covenant of good faith and fair dealing. See id. at 503 ("In Minnesota, the implied covenant of good faith and fair dealing does not extend to actions beyond the scope of the underlying contract."). We do not understand Minnesota law to impose a free-standing implied covenant between two parties who happen to have a contractual relationship with a third party, and Zyla has cited no case supporting that proposition.

2. Contract Claim Against Thomson

Zyla also asserts a breach of contract claim against Thomson. Pointing to Thomson's extension of the deadlines for the fourth edition, Zyla makes two arguments: (1) that Thomson's failure "to take appropriate actions, in light of Ms. Struble's delinquency and obstinacy, to enable Ms. Zyla to obtain the benefit of her work" violated the contract; and (2) that Thomson's extension of the deadline for the fourth edition was a violation of the contract in light of Thomson's interest in having Struble

-17-

complete work on the second edition of another of its books, Community Nutrition, thereby delaying the fourth edition of Personal Nutrition to Zyla's detriment. The argument on appeal is that the district court, relying on the contract's express terms, failed to consider how this conduct comprised a breach of the implied covenant of good faith and fair dealing.

The Third Edition Agreement gives Thomson the right to determine the scope and timing of the release of new editions. Under Section 1.4, Thomson "may, after consulting with Author, extend the Due Date" for the revised edition. Further, under Section 2, it was Thomson's prerogative to decide how to deal with the failure of an author to submit materials by a particular due date. The Fourth Edition Addendum did not revise either of those provisions.

Zyla is correct, nonetheless, that Thomson must assert its contractual powers in a way that does not transgress the implied covenant of good faith and fair dealing under Minnesota law. No reasonable jury could find here that Thomson violated that covenant. On the summary judgment record,[9] Thomson had entirely

_____

[9] Zyla argues that a jury need not accept Thomson's explanation for its decisions and so there is a dispute of fact. The explanation does not on its face appear implausible, defy common sense, or otherwise raise an inference of untruthfulness. To the contrary, the explanation is inherently reasonable and credible. There is no evidence even suggesting the explanation was false, and absent such evidence, mere unsupported claims to the contrary are not enough to support a plaintiff's verdict or defeat summary judgment. See Quintana-Ruiz v. Hyundai Motor Corp., 303

valid business reasons both for revising the schedule and for rejecting Zyla's proposal. Thomson acted reasonably in deciding to delay the fourth edition of <u>Personal Nutrition</u> in favor of Struble first finishing her work on another of its books, <u>Community Nutrition</u>, so she could then turn her full attention to <u>Personal Nutrition</u>, the book in which Thomson had a larger financial stake. Moreover, Thomson acted reasonably in sticking with its original allocations of work to Struble because it believed that her continued participation, as the original and lead author of <u>Personal Nutrition</u> and its later editions, was essential to the edition's success. The implied covenant does not require Thomson to elevate Zyla's interests over its own.[10]

D. <u>Tortious Interference With Advantageous Business Relations</u>

Zyla claimed that Struble committed a tort when she declined Zyla's proposal to reallocate a portion of her work and royalties to Zyla.

Because the laws of Massachusetts and of Minnesota are sufficiently similar on this issue, we need not decide which

---

F.3d 62, 75 (1st Cir. 2002).

[10] One might wonder why, if Zyla's work was indeed used in the fourth edition, she did not sue in quantum meruit. The answer may be that she was advanced $2,000.00 for expenses in anticipation of her work on the fourth edition. She had actual expenses of only $265.00 and did not return the rest. Further, her withdrawal caused Struble to hire two others to assist with the work that Zyla was to have done. Struble paid, out of her own pocket, those two persons the sums of $2,000.00 and $750.00, respectively.

state's law governs. Under Minnesota law, a plaintiff may recover from one who intentionally or improperly interferes with the plaintiff's prospective contractual relationships by inducing or causing a third person not to enter into or continue the prospective relationship or by preventing the plaintiff from acquiring or continuing the prospective relationship. United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 633 (Minn. 1982) (citing Restatement (Second) of Torts § 766B (1979)). Massachusetts law is consistent. Buster v. George W. Moore, Inc., 783 N.E.2d 399, 414 (Mass. 2003) (plaintiff must show "that the defendant knowingly and for an improper purpose or by improper means induced a party to breach a contract or not to enter into or continue a business relationship, resulting in damage").

Struble's refusal to give up her own contractual rights with Thomson in order to accommodate Zyla's desire for more work and more money, to Struble's own detriment, cannot constitute a tort. Struble's reasons, as outlined in her affidavit, were perfectly sound: her experience was that "textbooks often undergo schedule delays but are ultimately published with success," and she "had no reason whatsoever to believe that any such reallocation was necessary to ensure the successful publication of [the fourth edition]." There was no intent to interfere shown by the record. Again, Zyla's legal theory is simply inapposite.

E.  Declaratory Judgment Claim To Void the April 10 Agreement

-20-

After Zyla withdrew from the fourth edition, she signed the April 10 Agreement, which reduced her share of the royalties from 40% (what she would have received under the Fourth Edition Addendum if she had fully participated in the fourth edition) to 12.5%. She now sues to be excused from this agreement, claiming that the April 10 Agreement was induced by misrepresentations that her work would not be used in the fourth edition.

The district court rejected Zyla's claim because it found the April 10 Agreement immaterial. The court held that Zyla would receive the same royalty allocation under Section 7 of the Third Edition Agreement, which gave her one-half of her 25% royalty on the third edition if she did not participate in the fourth edition. Zyla responds that the district court impermissibly overlooked the Fourth Edition Addendum, which allocated 40% of the royalties to Zyla and 60% to Struble and provided that if the responsibilities of the authors changed, this allocation could be altered "upon written receipt [by] the Publisher of a letter from the Authors signed by both Authors reallocating the royalties." Thus, Zyla argues, the validity of the April 10 Agreement must be considered.

Accepting arguendo the premises of Zyla's argument, her claim still fails to survive summary judgment. There is no evidence of fraud in the inducement of the April 10 Agreement. To demonstrate such fraud, Zyla must show (1) that Thomson or Struble made knowingly false statements; (2) that those statements were

made with the intent to deceive; (3) that those statements were material to her decision to sign the April 10 Agreement; (4) that she reasonably relied on those statements; and (5) that she was injured as a result of her reliance. Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 225 (1st Cir. 2003) (applying Massachusetts law); see also Exeter Bancorporation v. Kemper Sec. Group, 58 F.3d 1306, 1310-11 (8th Cir. 1995) (applying a similar standard under Minnesota law). Zyla has not shown that Thomson or Struble knowingly made false statements or intended to deceive Zyla. There is no evidence that either Thomson or Struble intended to use Zyla's work in the fourth edition at the time the April 10 Agreement was signed.[11]

F. Mass. Gen. Laws Ann. ch. 93A

Zyla claims that any use of her work on the fourth edition without appropriate credit and compensation was an unfair and deceptive trade practice under Mass. Gen. Laws Ann. ch. 93A, §§ 2 and 11.

---

[11] The only evidence to which Zyla points is a November 1999 e-mail exchange among Zyla and two lower-level editors in which Zyla stated that because she had selected a particular New Yorker cartoon to be used in the fourth edition, Thomson could not use the cartoon now that she had withdrawn from the project. But even assuming Marshall and Struble were aware of this e-mail exchange, nothing about it suggests that Thomson or Struble intended to use Zyla's revisions. Struble states in her affidavit that, although she was aware that Zyla had chosen the cartoon, she made an independent choice to use it over several other options yielded in a search for "fast food" in a cartoon database. Zyla has not presented evidence controverting this account.

-22-

The district court viewed Zyla as having narrowed her ch. 93A claims to (1) the defendants' breach of contract, (2) Struble's interference with Zyla's advantageous relations, and (3) the defendants' allegedly fraudulent inducements to Zyla to sign the April 10 Agreement. Because these claims failed, the district court reasoned, the ch. 93A claim failed. Even if a broader reading of the ch. 93A claim were appropriate (after all, one might have an unfair trade practice without a breach of contract, see, e.g., Peggy Lawton Kitchens, Inc. v. Hogan, 466 N.E.2d 138, 140 (Mass. App. Ct. 1984) (theft of trade secrets)), the claim would still fail.

Thomson published the fourth edition without any prior notice from Zyla that Struble's work made unauthorized use of Zyla's work. There was no evidence that Thomson had any earlier reason to be aware that Struble had (allegedly) made unauthorized use of Zyla's work or that it failed in any of its duties. Its conduct on this score could not be unfair or deceptive. Nor could its prior conduct in extending deadlines, which was authorized by contract.

As to Struble, she cannot be held liable under § 11 unless the allegedly wrongful conduct occurred "primarily and substantially" in Massachusetts. Mass. Gen. Laws Ann. ch. 93A, §

-23-

11.[12]  This is a question of law, which we review de novo.  Roche v. Royal Bank, 109 F.3d 820, 827 (1st Cir. 1997).  Under § 11, Struble bears the burden of proof on this issue.  It is undisputed that Struble is a resident of New Jersey and that Thomson's place of business in the United States is in Connecticut.  Struble stated in her affidavit that all her work on the fourth edition was carried out in New Jersey, that she neither works nor does business in Massachusetts, and that there is no connection between Massachusetts and the preparation of the fourth edition other than the fact that Zyla lives in Massachusetts.  Zyla has not presented evidence controverting this statement.  Nor has she alleged in her complaint any actions taken by Struble in Massachusetts.  Zyla's 93A claim against Struble was properly dismissed.  See Garshman Co. v. GE, 176 F.3d 1, 7 (1st Cir. 1999) (conduct did not occur "primarily and substantially in Massachusetts" under ch. 93A where the plaintiff resided in Massachusetts and thus suffered the loss there, but most of the defendants' conduct occurred out of state).

G.  Denial of Motions To Amend and To Impose Sanctions

The district court correctly denied Zyla's motion to amend her complaint to bring a claim for punitive damages under Minnesota law.  The motion came too late and was, in any event, futile.

---

[12]     We also assume arguendo that Struble was herself engaged in "the conduct of any trade or commerce."  M.G.L. c. 93A § 2.

Zyla complains about the conduct of the defendants during a deposition.  It was well within the discretion of the district court to decide that the situation did not warrant its intervention or any form of sanction.

## III.

Entry of judgment for defendants is **affirmed**.  Costs are awarded to the defendants.  So ordered.