Kearney v. Elias                    CV-07-149-JL   08/11/08

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Gary Kearney,
Christopher R. Mulleavey,
and Kathleen Mulleavey

    v.                                    Civil No. 07-cv-149-JL
                                        Opinion No. 2008 NH 143
Brenda Elias and
William H. Constant


MEMORANDUM AND ORDER

Plaintiffs Gary Kearney, Christopher Mulleavey, and Kathleen Mulleavey, the purchasers of residential real estate in Franklin, New Hampshire, sued the seller, Brenda Elias, and her husband, William Constant, a real estate agent, seeking to recover damages for their failure to notify the plaintiffs about the presence of lead-based paint in the residence.  The plaintiffs claim that the defendants' failure to notify them was negligent and in violation of state and federal law.

This court has jurisdiction over this matter under 28 U.S.C. §§ 1331 (federal question) and 1332(a) (diversity of citizenship).

The parties have filed cross motions for summary judgment. The plaintiffs seek summary judgment as to liability on Counts I and VII, which allege violations of the Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. § 4852d, against

the defendants.  The defendants seek summary judgment on all of the plaintiffs' federal claims (Counts I, II, and VII), arguing that the plaintiffs have failed to demonstrate damages recoverable under 42 U.S.C. § 4852d(b)(3).  The defendants also seek summary judgment as to Count IV, which alleges that Elias is liable for negligent misrepresentation under state law.

After hearing oral argument on the cross motions, and after reviewing the parties' respective memoranda, objections, affidavits, and reply briefs, and for the reasons stated below, the plaintiffs' motion for summary judgment is granted as to Count I and denied as to Count VII.  The defendants' motion is granted as to Count IV and denied as to Counts I, II, and VII.

## I.  <u>APPLICABLE LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 56, a motion for summary judgment will be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2008) (amended December 1, 2007); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (decided under prior, substantially identical version of the rule); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986) (same).  "The object of summary judgment is to pierce the boilerplate of the pleadings

and assay the parties' proof in order to determine whether trial is actually required." Dávila v. Corporación de P.R. Para la Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007) (internal quotation marks omitted).

In this context, a "fact is 'material' if it potentially affects the outcome of the suit . . . and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists & Aero. Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996); see also Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001). In deciding whether summary judgment is proper, the court must view the entire record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Zyla v. Wadsworth, 360 F.3d 243, 246 (1st Cir. 2004). "Cross motions simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Littlefield v. Acadia Ins. Co., 392 F.3d 1, 6 (1st Cir. 2004).

Where, as is the case here with the plaintiffs' motion for summary judgment on their § 4852d claims, "the party moving for summary judgment bears the burden of proof on an issue, he cannot prevail 'unless the evidence that he provides on that issue is conclusive.'" EEOC v. Union Independiente de la Autoridad de Acueductos y Ancantarillados de P.R., 279 F.3d 49, 55 (1st Cir.

2002) (quoting <u>Torres Vargas v. Santiago Cummings</u>, 149 F.3d 29, 35 (1st Cir. 1998)).

## II.   <u>BACKGROUND</u>

In 1997, the New Hampshire Department of Health and Human Services, Office of Health Management ("HHS") issued an Order of Lead Hazard Reduction (the "HHS Order") to Joe Griffith, the owner of a multi-unit dwelling at 18 West Bow Street in Franklin, New Hampshire.  The HHS Order resulted from an inspection by an HHS representative, initiated when a child living at the address was found to be lead-poisoned.  The HHS Order required Griffith to conduct a full inspection and to abate all lead exposure hazards, which included the paint on a number of surfaces in the interior of the property which were identified in an attached "Lead Investigation Survey Form."  HHS records indicate that Griffith ignored the HHS Order, as did all subsequent owners including Elias and, eventually, the plaintiffs.

In 2000, Elias purchased the property at a foreclosure auction.  She did not learn of the HHS Order, however, until she received a letter from HHS some time after the purchase.  The letter stated in reference to the property, in relevant part:

An Order of Lead Hazard Reduction was issued . . . .

The requirements of the Order were transferred with the property when it was sold to you . . .  [T]he Order remains outstanding . . . .  [T]he Federal Lead-Based

-4-

Paint Hazard Reduction Act, 42 U.S.C. [§] 4852d, . . . requires sellers and landlords of most residential housing built before 1978 to disclose all available records and reports concerning lead-based paint and/or lead-based paint hazards to purchasers or tenants at the time of sale or lease . . . .

The letter also invited Elias to contact HHS for a copy of its Order, which Constant, Elias's husband and real estate business partner, subsequently did. Elias states that she also spoke with LuAnn Speikers of HHS, telling her about renovations Elias had done to the property since she had purchased it.[1] Elias claims that Speikers responded that "nothing more" needed to be done. So Elias did nothing further. HHS similarly did nothing to see whether the Order had in fact been satisfied.

Elias decided to sell the property in 2002. It was listed as an "exclusive agency listing," meaning that the owner reserved the right to sell the property independently without any commission to a real estate agent. Though Constant was initially identified as the "listing agent," the multiple listing so designated a different agent who worked for Constant and Elias, Heather Adams, as of August 29, 2002.

Constant showed the property to the plaintiffs, who eventually entered into a purchase and sale agreement with

---

[1] These renovations were not intended to remediate lead-based paint hazards, but, by Elias's own account, "to make the building more rent-worthy." They consisted largely of repainting without removing the existing lead-based paint.

Elias.  Constant claims that he informed Christopher Mulleavey about the history of the lead problems with the property in showing it to him prior to the sale, but Mulleavey denies that. And on a disclosure form, given to the plaintiffs as part of the transaction, Elias stated that she had no knowledge, reports, or records regarding lead-based paint or lead-based paint hazards in the property.  The transaction closed in November 2002.

About a year later, the plaintiffs entered into a purchase and sale agreement for the property with Paul and Virginia Gissing.  While the plaintiffs were unaware of the HHS Order at that time, Kearney received a copy of it in March 2006, prior to when the transaction with the Gissings closed.  Kearney says that he discarded the document without looking at it in detail because it was sent to his property management company, K&M Investments, which did not own the property.  He asked HHS for another copy of the order on April 11, 2006.  But Kearney did not disclose the existence of the HHS Order to the Gissings prior to their purchase of the property, which closed on April 22, 2006.

The Gissings later learned of the existence of the HHS Order from state officials, and subsequently threatened a legal action against the plaintiffs to recover the costs of compliance.  The plaintiffs ultimately entered into a settlement agreement with the Gissings to pay $80,000 for a release of all

-6-

claims.  The agreement recites that the Gissings "secured two estimates for the abatement of the lead-based paint from the subject property for $59,870 and $94,500" and that the Gissings also "suffered other financial losses including loss of rental income and have incurred consulting fees and attorney's fees."

The plaintiffs then brought this suit against Constant and Elias, alleging violations of § 4852d and the New Hampshire Consumer Protection Statute, N.H. Rev. Stat. Ann. § 358-A:2, as well as negligence and negligent misrepresentation under state common law.  They seek treble damages in the amount of $240,000, three times the $80,000 settlement paid to the Gissings.


III.  <u>ANALYSIS</u>

A.  <u>The § 4852d Claims</u>

1.  <u>Liability</u>

a.  <u>Elias (Count I)</u>

The Residential Lead-Based Paint Hazard Reduction Act directs the Environmental Protection Agency to promulgate regulations that, among other things, require that a seller or lessor of housing offered for sale or lease, "before the purchaser or lessee is obligated under any contract to purchase or lease the housing," both "disclose to the purchaser or lessee the presence of any known lead-based paint, or any known lead-

-7-

based paint hazards, in such housing and provide to the purchaser or lessee any lead hazard evaluation report available to the seller or lessor . . . ." 42 U.S.C. § 4852d(a)(1)(B). The regulations so provide. 24 C.F.R. § 35.88(a)(3). They further provide that "[t]he seller or lessor shall provide the purchaser or lessee with any records or reports available to the seller or lessor pertaining to lead-based paint or lead-based paint hazards in the target housing being sold or leased."[2] Id. § 35.88(a)(4).

As an enforcement mechanism, the Act creates a private right of action in a purchaser or lessee against a seller or lessor: "Any person who knowingly violates the provisions of this section shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual." 42 U.S.C. § 4852d(b)(3). But it is the regulations, rather than the Act itself, that is the source of the enforceable disclosure obligations. Sweet v. Sheahan, 235 F.3d 80, 88 (2nd Cir. 2000).

---

[2] "Target housing" is defined as "any housing constructed prior to 1978, except housing for the elderly or persons with disabilities (unless any child who is less than 6 years of age resides in or is expected to reside in such housing) or any 0-bedroom dwelling." 24 C.F.R. § 35.86. It is undisputed that the property in this case is "target housing" because it was built before 1978 and no exceptions apply.

The plaintiffs argue that they are entitled to summary judgment on Count I, alleging that Elias violated 42 U.S.C. § 4852d in her individual capacity, and Count VII, alleging that Constant violated 42 U.S.C. § 4852d in his capacity as an agent, because the undisputed facts demonstrate that both defendants were aware of the HHS Order but failed to disclose it to the plaintiffs prior to their purchase, in violation of § 4852d.

It is undisputed that, despite having notice of the pending HHS Order and her obligations as a seller under § 4852d, Elias disclosed neither the HHS Order nor the lead-based paint hazards to which it referred to the plaintiffs before selling them the property. These undisputed facts establish that Elias violated the Act's disclosure obligations in two ways. First, she failed to "disclose to the purchaser ... the presence of [the] known lead-based paint, or [the] known lead-based paint hazards" indicated by the outstanding HHS Order. Second, she failed to "provide to the purchaser ... [the] lead evaluation report available to [her]," namely, the "Lead Investigation Survey Form" appended to the HHS Order. See 42 U.S.C. § 4952(a)(1)(B); 24 C.F.R. §§ 35.88(a)(3), (4).

Elias nevertheless argues that she could not have failed to disclose any "known lead-based paint hazards," based on her account that Spiekers, the HHS official, told Elias before she sold the property to the plaintiffs that "nothing more" needed

-9-

to be done to satisfy the HHS Order.  But even accepting this claim as true, as the court must for purposes of the plaintiffs' motion for summary judgment, would arguably eliminate Elias's liability under the Act only for failing to disclose the hazards themselves.  It would not affect her liability for violating the Act's independent requirement that the seller "provide to the purchaser . . . any lead hazard evaluation report available to the seller."  See Pellegrini v. Cent. 21, No. 05-30077, 2007 WL 2219331, at *7 (D. Mass. July 20, 2007) (denying summary judgment for defendants on § 4852d claim, despite fact that they had disclosed presence of lead-based paint hazards, where disputes remained as to whether they had provided the "lead hazard information pamphlet" required by § 4852d(a)(1)(A)).  The defendants do not address this theory of liability in opposing the plaintiffs' motion for summary judgment.

In fact, in the sole case on which the defendants rely on this point, the court entered summary judgment for the plaintiffs on a claim under § 4852d premised on the same theory: that the defendants had failed to provide the plaintiffs with a report in their possession showing lead paint levels in the property prior to their agreement to purchase it, despite the defendants' knowledge of their obligation to do so.  Smith v. Coldwell Banker Real Est. Servs., Inc., 122 F. Supp. 2d 267, 274-75 (D. Conn. 2000).  The court granted this relief because

-10-

the defendants came forward with no "evidence rebutting the conclusion that [they] knowingly violated the Act by failing to ensure the purchasers were timely provided a copy of the lead paint report."  Id. at 274.  So too with the defendants here.  Because the undisputed facts conclusively show that Elias violated the Act's mandate to provide the plaintiffs with a lead hazard evaluation report available to her, the plaintiffs' motion for summary judgment on Count I is granted.[3]

   b.  **Constant (Count VII)**

In addition to regulations imposing disclosure requirements on sellers and lessors, the Act also directs the EPA to enact regulations that "require the agent, on behalf of the seller or lessor, to ensure compliance with the requirements of" §§ 4852d. 28 U.S.C. § 4852d(a)(4).  The EPA has done so.  See 24 C.F.R. § 35.94.  Because only Elias, and not Constant, was a "seller" of the property when the plaintiffs entered into the agreement to buy it, Constant can be liable under § 4852d only if he was acting as Elias's agent in that transaction.  The regulations define "agent" as "any party who enters into a contract with a seller or lessor, including any party who enters into a contract

_____

   [3]  As discussed infra part II.B, the court rejects the defendants' arguments for summary judgment in their favor on this claim.

with a representative of the seller or lessor, for the purpose of selling or leasing target housing."[4]  Id. § 35.86.

The undisputed material facts do not demonstrate that Constant was an "agent" under 24 C.F.R. § 35.86.  The plaintiffs have failed to show any "contract," either express or implied, between Constant and Elias for the purpose of selling the property.  Indeed, the only evidence the plaintiffs have entered on this point is the fact that Constant was listed as a "listing agent" on a listing sheet for the property at some time prior to the sale.  This alone is insufficient to conclusively establish the existence of a contractual relationship between Constant and Elias.  Moreover, all of the relevant transactional documents recite that there was no agent for the sale.  While Constant's conduct in showing the property on his wife's behalf might support a finding of agency under common law principles, it does not suffice to establish the "contract . . for the purpose of selling" the property necessary to make him an agent, and to impose the corresponding duties, under § 4852d(a)(4).  The

---

[4]  In the absence of any challenge to the validity of the EPA's interpretation of § 4852d in its regulations, this court will follow the agency's construction of the statute.  See In re Slater Health Ctr., Inc., 398 F.3d 89, 103 (1st Cir. 2005) (applying regulations as promulgated by an agency when neither party challenged them); see also Sullivan v. Greenwood Credit Union, 520 F.3d 70, 75 (1st Cir. 2008) (holding as a matter of statutory interpretation that a term's statutory definition trumps the term's definition at common law).

plaintiffs' motion for summary judgment on their § 4852d count against Constant is denied.

## 2. <u>Damages</u>[5]

The parties have cross-moved for summary judgment on the issue of damages for the defendants' alleged § 4852d violations. The plaintiffs argue that, as a matter of law, they are entitled to recover three times the amount they paid in settlement of the Gissings' claims against the plaintiffs. The defendants, however, argue that the cost of that settlement is not recoverable against them because it resulted from the plaintiffs' alleged violations of § 4852d in selling the property to the Gissings, rather than the defendants' alleged violations of § 4852d in selling the property to the plaintiffs. The defendants further argue that, even they could be liable for the costs of the settlement, factual disputes remain as to the reasonableness of those costs as a measure of damages, precluding summary judgment for the plaintiffs on that issue.

As noted supra, "Any person who knowingly violates the provisions of [§ 4852d] shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount

---

[5] For purposes of the following discussion, the court will assume that the plaintiffs can establish that Constant violated his obligations as an "agent" under the Act.

of damages incurred by such individual."  42 U.S.C. § 4852d(b)
(3).  Neither the statute nor its implementing regulations
contain any definition of the phrase "damages incurred."  The
defendants' argument that the phrase excludes what the
plaintiffs paid the Gissings to settle their claim rests on the
assumption that the phrase implies some causal connection
between the violation of § 4852d and the damages in question.
The assumption is reasonable:  § 4852d(b)(3) cannot be read to
impose liability on a seller for a buyer's injuries that are
unrelated to the statutory violations at issue.

Indeed, under well-established principles of statutory
construction, the common-law term "damages" in § 4852d(b)(3)
must be given its common-law meaning, due to the absence of a
different definition in the statute.  See Safeco Ins. Co. of Am.
v. Burr, 127 S. Ct. 2201, 2209 (2007).  A causal relationship
with the defendant's conduct is part of the common-law
definition of "damages":  "[a] pecuniary compensation or
indemnity, which may be recovered in the courts by any person
who has suffered loss, detriment, or injury, whether to his
person, property, or rights, through the unlawful act or
omission or negligence of another."  Black's Law Dictionary 351-
52 (5th ed. 1979) (emphasis added); see also Restatement
(Second) of Torts § 12A (1979) ("'damages' is used . . . to

denote a sum of money awarded to a person <u>injured by</u> the tort of another") (emphasis added).

The court cannot say, however, that the plaintiffs' claimed injuries here so lack any causal connection to the defendants' violations of § 4852d that they cannot be liable for those injuries as a matter of law. There are genuine issues of fact material to what would have happened if the defendants had disclosed the lead hazard evaluation report to the plaintiffs before they agreed to buy the property, as required by the Act. Kearney has averred, for example, that the plaintiffs simply would not have gone forward with their plans to purchase the property, presumably to avoid the costs of remediating the hazards. The defendants argue, in essence, that the plaintiffs were able to avoid those costs anyway by selling the property to the Gissings without complying with the disclosure requirements of § 4852d. But, more accurately, the plaintiffs attempted to do so, but their attempt was thwarted when the Gissings learned of the lead hazards on the property subsequent to the purchase and threatened to sue the plaintiffs for violating § 4852d, leading the plaintiffs to pay the Gissings to settle that claim.

This sequence of events precludes the ruling, as a matter of law, that the defendants' failure to comply with § 4852d did not cause the plaintiff's injury in the form of their payment to settle the Gissings' claim. It can be argued that the

-15-

plaintiffs would not have faced that claim had they complied with their own obligations under § 4852d, but it can also be argued that the plaintiffs would not even have incurred those duties in the first place had the defendants honored their own obligations under the Act. Furthermore, even if the plaintiffs had made the required disclosures to the Gissings, it is a reasonable inference on the record as it stands that they either would have refused to buy the property or agreed to go through with the transaction only if the plaintiffs agreed to remediate the lead hazards first (or at least reduce the purchase price to reflect the cost to the Gissings to do that work themselves). In any of these scenarios, the plaintiffs would have suffered some financial injury traceable to the defendants' own nondisclosure. Determining the relative likelihood of these various outcomes, and the corresponding amount of loss to the plaintiffs, are ultimately factual dilemmas for the jury. See, e.g., Wortley v. Camplin, 333 F.3d 284, 295 (1st Cir. 2003) ("Proximate causation and intervening cause are usually issues for the jury to resolve.").

The defendants' real argument seems to be that, since they are no more culpable of violating § 4852d than are the plaintiffs, it is unfair to allow them to recover under the statute, particularly in an amount three times the amount of their damages. But the Act does not itself impose any bar on

-16-

recovery under these circumstances and, even at common law, this kind of "unclean hands" defense is available only against equitable relief, not claims for damages.[6]  See, e.g., 2 Dan B. Dobbs, Law of Remedies § 9.6, at 626-27 (2d ed. 1993).  Indeed, in considering analogous claims for common-law fraud, courts have rejected the "argument that a tort action for fraudulent misrepresentation against the seller of real property is somehow waived when the buyer in turn conveys the property to a third party."  Budunov v. Kutsev, 164 P.3d 1212, 1219 (Or. Ct. App. 2007); see also Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc., 453 N.Y.S.2d 750, 754 (N.Y. App. Div. 1982); 37 C.J.S. Fraud § 117 (1994).

The defendants do not provide any authority on this point. They rely on the decision of the court of appeals in Mason ex

---

[6]  There is a common-law rule that "[w]here a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land . . . , which was created by the misconduct of the other or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the other for expenses properly made in the discharge of such liability, unless after discovery of the danger, he acquiesced in the continuation of the condition."  Restatement (First) of Restitution § 95 (1937).  But, assuming that the defendant's liability to the plaintiffs for their costs of discharging their own liability to the Gissings under § 4852d is analogous to this principle, and assuming further that § 4852d should be read to incorporate this rule--points on which the court does not rule at this time--the defendants have not argued, much less attempted to show as a matter of law, that the plaintiffs "acquiesced in the continuation of the condition" of the property under this rule.

rel. Heiser v. Morrisette, 403 F.3d 28 (1st Cir. 2005), for the proposition that "one should not expect [§ 4852d] to be an end-all or be-all answer to the damages arising from the failure to make a federally required disclosure." Mason, however, did not consider the scope of the damages available under § 4852d(b)(3), but simply whether it conferred a private right of action to the minor children of lessees injured by lead hazards in their apartment which were not disclosed by the owner as required by the Act.[7]  403 F.3d at 28.

In Mason, the court of appeals held that the children lacked standing to sue because "the plain language of the statute limits recovery under § 4852d(b)(3) to a 'purchaser or lessee,'" a limitation the court deemed "consistent with the purpose of the disclosure provision" to allow purchasers or lessors to make an informed decision as to whether to contract for property with lead-based paint hazards. Id. at 31. So Mason does not intimate that, when purchasers like the plaintiffs here are deprived of that opportunity, their damages should be limited in the way the defendants suggest.[8]

---

[7]  Coincidentally, the property in question in Mason, 18-A West Bow Street, Franklin, is right next to the property at issue in this case, 18 West Bow Street, Franklin.

[8]  The court in Smith, in rejecting the argument that § 4852(b)(3)'s "'knowingly violate' standard requires a showing of bad faith or willfullness," 122 F. Supp. 2d at 273, reasoned that "the automatic trebling of the plaintiff's actual damages

By the same token, however, the plaintiffs have provided no authority in support of their view that, because they were victimized by the defendants' failure to make the disclosures required by § 4852d, the plaintiffs are entitled to recover, as a matter of law, their settlement payment to the Gissings. Drawing again on the (perhaps imperfect) analogy to indemnification principles, see note 6, supra, a plaintiff seeking recovery from a defendant for the cost of settling a third party's liability against the plaintiff arising from the defendant's conduct must show (1) actual liability to the third party, (2) the absence of a good defense to that liability, and (3) that the amount of the settlement was reasonable.[9]  42

---

incurred . . . serves as an important incentive to those directly injured by the violation to seek compensation for their injury as well as their effort in enforcing the law."  Id. at 274.  Thus, like the circuit in Mason, the court in Smith was not considering the scope of the damages available, but a different limitation on § 4852d(b)(3), namely, the scienter requirement.  In any event, there is authority contradicting the Smith court's "directly injured" gloss:  in enacting the regulation which mirrors § 4852d(b)(4), the EPA appears to have taken a less restrictive view of the damages recoverable, explaining, "This provision allows the purchaser or lessee to seek direct compensation for any damages incurred based on the seller's or lessor's noncompliance."  61 Fed. Reg. 9064, 9078 (Mar. 6, 1996) (emphasis added).  Finally, even assuming Smith was correct to suggest that recovery is restricted to "those directly injured by the violation," the record does not permit the conclusion, as a matter of law, that the plaintiffs were not "directly injured" by the defendants' nondisclosure, for the reasons already discussed.

[9]  This rule applies where, as here, the plaintiff has failed to notify the defendant of the third party's claim before settling it.  42 C.J.S. Indemnity § 28.

C.J.S. Indemnity § 28 (1994); see also, e.g., Gulf Grp. Holdings, Inc. v. Coastal Asset Mgmt. Corp., 516 F. Supp. 2d 1253, 1262-63 (S.D. Fla. 2007); St. Paul Fire & Marine Ins. Co. v. Michelin Tire Corp., 298 N.E.2d 289, 292 (Ill. App. Ct. 1973); Nat'l Union Fire Ins. Co. of Pittsburgh v. Red Apple Grp., Inc., 767 N.Y.S.2d 68, 69 (N.Y. App. Div. 2003).

The plaintiffs have come forward with sufficient evidence on these elements to avoid summary judgment against them on the issue of damages. Though the plaintiffs' liability to the Gissings under § 4852b has not been conclusively established, given factual disputes as to when Kearney learned of the lead hazards vis-a-vis the status of the parties' purchase and sale agreement, neither can the court rule that the plaintiffs were not liable to the Gissings or had a good defense to their claim as a matter of law. The plaintiffs have also come forward with evidence, principally the affidavit of the Gissings' property manager, tending to show that they suffered more than $80,000 in losses as a result of the plaintiffs' nondisclosure and that the settlement amount was therefore reasonable, particularly in light of the damage multiplier contained in § 4852d(b)(3). To be sure, the defendants have responded with evidence to the contrary, but the ultimate resolution of this conflicting evidence presents a question for the jury. See, e.g., Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1094-95 (1st Cir.

-20-

1989). Neither party is entitled to summary judgment on the issue of damages.


B.   **The state-law claim against Elias "as a real estate agent" (Count IV)**

The plaintiffs allege state-law claims of negligent misrepresentation against Elias in her individual capacity (Count III) and in her capacity "as a real estate agent" (Count IV) based on her statements "that there were no known lead-based paint hazards or lead-based paint disclosures." Count IV also alleges that Elias "as real estate agent, made a misrepresentation that said agent had informed the seller (herself) of seller's obligation under 42 U.S.C. § 4852(d) and is aware of her responsibility to insure compliance."

The defendants move for summary judgment on the ground that Elias cannot be liable as a seller and also as an agent for failing to make a disclosure to herself as the seller. Whatever the merits of this theory as a metaphysical matter, the plaintiffs have not defended this count in response to the defendants' summary judgment motion, and have presented no evidence that Elias acted as a real estate agent, as opposed to the seller, in selling the property to the plaintiffs. The defendants are entitled to summary judgment on Count IV.

## IV. CONCLUSION

For the foregoing reasons, the cross-motions for summary judgment are granted in part and denied in part. The plaintiffs' motion for summary judgment is granted as to Elias's liability on Count I. The defendants' motion for summary judgment is granted as to Count IV. The motions are otherwise denied.


SO ORDERED.

_____
Joseph N. Laplante
United States District Judge


Dated:  August 11, 2008

cc:  Finis E. Williams, III, Esq.
     James B. Kazan, Esq.