NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0606n.06

No. 09-1195

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Sep 13, 2010

LEONARD GREEN, Clerk

ROBERTO ROMERO, M.D.,                    )
                                         )
        Plaintiff-Appellant,             )          ON APPEAL FROM THE
                                         )          UNITED STATES DISTRICT
v.                                       )          COURT FOR THE EASTERN
                                         )          DISTRICT OF MICHIGAN
IRINA BUHIMSCHI, M.D.; YALE UNIVERSITY,  )
                                         )                **O P I N I O N**
        Defendants-Appellees,            )
                                         )
and                                      )
                                         )
                                         )
CARL WEINER, M.D.; ROYAL COLLEGE OF      )
OBSTETRICIANS AND GYNAECOLOGISTS;        )
JOHN DOE, A-G,                           )
                                         )
        Defendants.                      )

BEFORE:     NORRIS, MOORE, and McKEAGUE, Circuit Judges.

**McKeague, Circuit Judge.** Roberto Romero, M.D., filed suit in federal district court against numerous defendants in connection with the publication of a manuscript in the *British Journal of Obstetrics and Gynaecology*. The portion of the suit relevant to this appeal involves Irina Buhimschi, M.D., the primary author of the manuscript, and her employer Yale University. Romero alleged that both Buhimschi and Yale defamed him through statements made about his contribution to the manuscript and his involvement in other research. Romero also alleged that Buhimschi

breached an implied contract when she published the manuscript without listing Romero as a co-author. Finally, Romero alleged that both Buhimschi and Yale violated the Lanham Act by failing to acknowledge that Romero had contributed to the research underlying the manuscript. The district court dismissed the Lanham Act claim and granted summary judgment in favor of the defendants on the defamation and contract claims. Romero now appeals these decisions. After carefully considering Romero's arguments, we AFFIRM the decisions of the district court.

## I.

Roberto Romero is a physician with a sub-speciality in maternal-fetal medicine and works as chief of the Perinatology Research Branch of the National Institute of Child Health and Human Development. Romero also holds a tenure position with the National Institute of Health ("NIH"). At the time relevant to this litigation, Romero was a full-time employee with the federal government; he held no outside employment. Though he was employed directly by the federal government, Romero's position was part of a contract awarded to Wayne State University whereby the NIH provided funds and advice to Wayne Sate University. Romero served as the project officer under the contract, which required him to provide technical direction, review performance, provide advice, and review invoices. In addition to his duties as a project officer, Romero had duties associated with his role as branch chief of the Perinatology Research Branch. Specifically, Romero developed a research plan for the Perinatology Research Branch, developed scientific projects, mentored faculty and fellows, drafted manuscripts, and evaluated projects. These research and drafting activities were part of Romero's federal job responsibilities.

Irina Buhimschi, M.D., was recruited by Wayne State University in late 2000 to work as an assistant professor in the Division of Maternal-Fetal Medicine. Buhimschi was employed directly by Wayne State University and not the federal government. At the time she was recruited, Buhimschi and Romero discussed the possibility of collaborating on research together. Romero admits that this collaboration with Buhimschi was part of his federal job responsibilities. However, he nonetheless alleges that an implied-in-fact contract existed between himself and Buhimschi beginning in March of 2002, whereby the two would collaborate on research. According to Romero, the terms of this contract specified that Buhimschi would run the experiment while Romero would assist with experimental design, provide comments, and aid with the preparation of a manuscript. In addition, Buhimschi would include Romero as a co-author on any article for which Romero met authorship criteria.

Romero began collaborating with Buhimschi before she arrived at Wayne State University. The initial collaboration included working with Buhimschi to conduct blood analysis for the presence of a specific enzyme and providing reagents, antibodies, and standards. Romero and other individuals at the Perinatology Research Branch continued to collaborate with Buhimschi during her time at Wayne State University. Specifically, Romero and another physician designed the criteria for the second phase of the study. Romero also suggested that Buhimschi submit the manuscript to *The Lancet*, a medical journal. The manuscript included work on which Romero had collaborated, and Romero was listed as a co-author on the submission. Soon after the manuscript was submitted, Romero's relationship with Buhimschi took a turn for the worse. Communication between the two became almost non-existent. During this time, Buhimschi also relocated to Yale University.

Romero then became aware that Buhimschi had removed his name as a co-author on *The Lancet* manuscript. At this point, Romero wrote a letter to the vice president of Wayne State University, and a formal complaint was filed with the university regarding the removal of Romero and other contributors' names. In response to the complaint, the university held a hearing into whether Buhimschi had committed scientific misconduct, and Romero testified at this hearing. In addition to his Wayne State complaint, Romero also discussed the matter with *The Lancet*, which prompted the journal to decline publishing the piece. Romero then became concerned that Buhimschi would seek to publish the manuscript in a different journal, so he urged Wayne State University to prepare a plan of action to respond to this possibility. He also notified Wayne State that if Buhimschi published the manuscript without proper authorship credit, the publication could create a problem with the contract between the Perinatology Research Branch and Wayne State University.

The investigative committee at Wayne State issued a report of its findings in 2004. The report concluded that Buhimschi had committed misconduct on two of the counts but that there was insufficient evidence as to one of the counts. Romero objected to the committee's findings on this last count, and he attempted to forward additional evidence to the committee in an effort to change the committee's findings. Romero also objected to the committee's recommended remedy, which included providing a two year period of oversight of Buhimschi's publications. After learning of the committee's findings, Buhimschi appealed the decision in a letter dated January 20, 2005. Further, in accordance with Wayne State policy, Yale University was notified of the committee's findings, though Yale declined to take action until Wayne State considered Buhimschi's appeal.

At around this same time, Romero became aware that the *British Journal of Obstetrics and Gynaecology* ("BJOG") intended to publish a modified version of the manuscript; a version which did not include Romero as a co-author. Romero then notified officials at Wayne State University and suggested that the university contact BJOG about the authorship dispute. He continued to follow up with Wayne State officials about their contact with BJOG, and he assisted Wayne State officials in their communications with BJOG staff by comparing *The Lancet* manuscript with the BJOG manuscript. In correspondence between BJOG and Wayne State officials, BJOG staff indicated that they were aware of the authorship dispute and that they had been in contact with Buhimschi. BJOG officials stated that they intended to publish a correction if it was later found that Romero deserved authorship credit.

Through communications with BJOG staff, Romero also became aware of a thirty-one page appeal letter that Buhimschi had sent to the Wayne State University investigative committee. In the letter, Buhimschi denied wrongdoing and criticized Romero and Wayne State University. Buhimschi also sent this letter to BJOG, which in turn provided a copy to Romero. This letter forms part of Romero's defamation claim against Buhimschi and Yale University. Romero contends that this letter contains twenty-nine separate defamatory statements.

In spite of Romero's protests, BJOG published the manuscript, without giving credit to Romero or his team at Wayne State University, in early 2005. Immediately thereafter, Yale University issued a press release crediting Yale researchers and a Yale team with the results of the research. The press release did not contain any mention of Romero or researchers at Wayne State

University. This press release, along with the manuscript itself, forms the basis of Romero's Lanham Act claim.

In the meantime, Wayne State University denied Buhimschi's appeal from its finding of scientific misconduct on February 16, 2005, which prompted Yale to appoint an ad hoc committee to evaluate the matter. In connection with Yale's ad hoc committee investigation, Buhimschi supplied Yale officials with an email sent by her former supervisor Carl Weiner, M.D., to BJOG staff regarding her submission of the manuscript. In the email, Weiner described the background of the research and manuscript and explained his position that Romero was not involved with the research in a manner that entitled him to authorship credit. Buhimschi's republication of this email to a deputy general counsel at Yale University forms a second portion of Romero's defamation claim. Also in connection with the Yale ad hoc committee, Lawrence Cohen, M.D., an Integrity Officer at Yale University, sent a letter to committee members providing background information on the dispute and giving the committee instructions. This letter forms the final portion of Romero's defamation claim.

Romero was apparently dissatisfied with the outcome of the investigations at Wayne State University and Yale University, and he filed the instant action in federal district court in February 2006. An amended complaint was filed in June 2006, which contained seven counts of wrongdoing against eleven named and unnamed defendants. Of the seven counts and eleven defendants, only two defendants and three counts are relevant to this appeal. Specifically, this appeal involves: (1) Romero's claim of violation of the Lanham Act against Buhimschi and Yale; (2) Romero's claim of breach of an implied-in-fact contract against Buhimschi; and (3) Romero's claim of defamation

against Buhimschi and Yale. These claims were disposed of in the district court under different procedural postures.

Specifically as to the Lanham Act claim, both Yale and Buhimschi filed motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The motions were premised on the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003). A magistrate judge evaluated the motions and issued a report and recommendation stating that the Lanham Act claim was barred by *Dastar*, and the district court adopted this recommendation. As to the contract and defamation claims, discovery moved forward and both Yale and Buhimschi filed motions for summary judgment. The district court granted summary judgment in favor of Yale and Buhimschi on these claims, finding that the contract claim failed because Romero had a preexisting duty to perform the contract and the defamation claim failed because Romero impliedly consented to the defamations through his initiation of the investigation. Romero appeals this decision along with the dismissal of the Lanham Act claim.[1]

**II.**

We begin by addressing our jurisdiction over the issues presented in this appeal. The district court possessed subject matter jurisdiction over the Lanham Act claim pursuant to 28 U.S.C. § 1331. It possessed diversity jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1332 because

---

[1]Romero has also filed a motion to expand the record on appeal and seeks to include seventeen additional exhibits that the district court struck from the record in evaluating his motion for reconsideration. Because Romero has failed to argue any of the equitable factors for expanding the record on appeal, we deny this motion. *See United States v. Murdock*, 398 F.3d 491, 500 (6th Cir. 2005).

all of the parties were diverse and Romero alleged an amount-in-controversy greater than $75,000.

We possess jurisdiction over final decisions of the district court pursuant to 28 U.S.C. § 1291.

**III.**

In evaluating Romero's Lanham Act claim, we review de novo the district court's dismissal

under Rule 12(b)(6). *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 608–09 (6th Cir. 2009). "[T]o

survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient 'to

raise a right to relief above the speculative level,' and to 'state a claim to relief that is plausible on

its face.'" *Id.* at 609 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This

burden is met if the pleadings contain sufficient factual content to allow the court to infer liability

for the alleged misconduct. *Id.*

The Lanham Act creates a civil cause of action in favor of any person who is injured by false

designations of origin or false descriptions. 15 U.S.C.A. § 1125(a). Section 43 of the Act states:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action . . . .

*Id.* This section of the Lanham Act provides broad federal remedies beyond simple trademark

protection. *Dastar*, 539 U.S. at 29.

The Supreme Court interpreted this section in *Dastar Corp. v. Twentieth Century Fox Film Corp.* 539 U.S. at 25. Specifically, the Court addressed "whether § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prevents the unaccredited copying of a work . . . ." *Id.* In *Dastar*, Twentieth Century Fox sued Dastar under a theory of reverse passing off[2] for Dastar's sale of a video series on General Eisenhower's crusade through Europe. *Id.* at 26–27. To make the series, Dastar purchased beta cam tapes of a 1949 series, which Fox owned the rights to but had let the copyright expire. *Id.* Dastar then edited the series by changing the opening and closing sequence, inserting new titles, rearranging the "recap" section, and removing references to a corresponding book. *Id.* Dastar advertised its series as being produced and distributed by a Dastar-owned company and included a credit line "DASTAR CORP presents." *Id.* at 27. The Dastar series made no reference to the original series owned by Fox. *Id.*

In determining whether Dastar's actions violated the Lanham Act, the Supreme Court focused its inquiry on the meaning of origin of goods in § 43(a)(1)(A). *Id.* at 31. The Court stated that "origin of goods" could not mean "the person or entity originating the ideas or communications" because such a meaning would stretch the text and purpose of the Lanham Act. *Id.* at 32. Under *Dastar*, the Lanham Act can not be read to encompass communicative products, whose origins have little consequence to purchasers, because this reading would conflict with copyright law and would render portions of that body of law superfluous. *Id.* at 33–35. "Reading 'origin' in § 43(a) to require attribution of uncopyrighted materials would pose serious practical problems." *Id.* at 35. Thus, the

---

[2]Reverse passing off (also known as palming off) occurs when a party misrepresents someone else's goods or services as his own. *Dastar*, 539 U.S. at 27, n.1.

Court held that the Lanham Act did not create a cause of action for behavior that amounted to plagiarism or the use of unprotected work without attribution. *Id.* at 36. However, the Court left open the possibility that a cause of action could exist under the misrepresentation prong of § 43(a)(1)(B). *Id.* at 38. Specifically, if Dastar had given purchasers the impression through advertising or promotion that its series was substantially different from the series on which it was based, Fox could have stated a claim under § 43(a)(1)(B). *Id.*

This court has applied *Dastar* and held that the use of educational materials, including workbooks and audiotapes, without proper attribution did not violate the Lanham Act because "taking the intellectual property contained in [] goods and incorporating it into your own goods does not" constitute a violation. *Nat'l Bus. Dev. Servs. v. Am. Credit Educ. & Consulting Inc.*, 299 F. App'x 509, 511 (6th Cir. 2008). Similarly, the First Circuit held that a claim for failing to attribute authorship credit on a college textbook did not create a cause of action under the "false origin" section of the Lanham Act. *Zyla v. Wadsworth*, 360 F.3d 243, 252 (1st Cir. 2004). The *Zyla* court nevertheless noted that "[t]he Court in *Dastar* left open the possibility that some false authorship claims could be vindicated under the auspices of § 43(a)(1)(B)'s prohibition on false advertising." *Id.* at 252 n.8.

Other Circuits have noted that *Dastar*'s holding was limited to § 43(a)(1)(A), but have rejected the claim that false designation of authorship or licensing is actionable under § 43(a)(1)(B). *See, e.g.*, *Baden Sports, Inc. v. Molten USA, Inc.*, 556 F.3d 1300, 1307 (Fed. Cir. 2009); *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1144 (9th Cir. 2008). In *Baden Sports*, the Federal Circuit applied Ninth Circuit law and rejected an argument that Molten, a manufacturer of

basketballs, violated § 43(a)(1)(B) by advertising that dual cushion technology was a "Molten innovation." *Id.* at 1302–03, 1305. The "Molten innovation" claim was false because another basketball manufacturer had developed the technology. *Id.* at 1302–03. However, the Federal Circuit held that the claim was not actionable because the "Molten innovation" advertising materials did not concern the "origin of goods" prong under § 43(a)(1)(A) nor did the materials concern the "nature, characteristics, [or] qualities" prong under § 43(a)(1)(B). *Id.* at 1305. According to the Federal Circuit, "nature, characteristics, and qualities" under § 43(a)(1)(B) refers to the characteristics of the good itself, rather than authorship designation. *Id.* at 1307. To read the Lanham Act otherwise would put it in conflict with patent and copyright law. *Id*.

In this case, Count I of Romero's complaint alleges violation of the Lanham Act by reverse palming off. The count specifically alleges that: (1) Buhimschi passed off research and results as findings by "Yale researchers" rather than collaboration with a Wayne State team; (2) Buhimschi and Yale misrepresented the research and findings in the BJOG article as being conducted at Yale by Yale faculty; (3) Buhimschi and Yale issued a press release that attributed the work to Yale researchers and a "Yale team" but failed to identify the names of collaborators; and (4) the article contained false and misleading statements about where and how the research was conducted and funded. The complaint alleged that these representations misled the scientific community as to the origin of the research. In the complaint, this claim was titled "Reverse Palming Off," yet it did not cite any specific provision of the Lanham Act. In evaluating the defendants' motion to dismiss, both the magistrate judge and the district court held that Count I failed to state a claim under *Dastar*, without evaluating whether Romero stated a claim under § 43(a)(1)(B) of the Lanham Act. *Romero*

*v. Buhimschi*, 2:06-cv-10859 at 4 (E.D. Mich. Sept. 28, 2007); *Romero v. Buhimschi*, 2:06-cv-10859 at 7–11 (E.D. Mich. May 22, 2007).

To the extent that Romero's claim relies on § 43(a)(1)(A)'s "origin of goods" prong, the claim clearly falls within the scope of *Dastar*. Aside from the fact that *Dastar* involved a video and this case involves a manuscript, the cases are nearly identical because both plaintiffs alleged that the defendants used portions of the plaintiffs' work but failed to attribute the work to the plaintiffs. And the Court in *Dastar* made clear that origin did not refer to the person originating the idea and could not be read to apply to communicative products. 539 U.S. at 32, 35. Thus, Romero's Lanham Act claim fails in as much as it alleges that Buhimschi and Yale failed to credit Romero's work in the manuscript. However, at least one Circuit has left open the possibility that a claim can be made for misrepresenting authorship in promotional material or advertisements under § 43(a)(1)(B). *See Zyla*, 360 F.3d at 252 n.8. And at least a portion of Romero's pleadings allege that Yale violated the Lanham Act through its press release.

Assuming that a portion of Romero's pleadings could fall under § 43(a)(1)(B)'s advertising prong, the misconduct alleged in the pleadings would have to relate to the "nature, characteristics, qualities, or geographic origin" of the manuscript. 15 U.S.C.A. § 1125(a). The Federal Circuit's decision in *Baden Sports* provides guidance on this issue because that court held that false advertising materials, which claimed that basketball technology was a "Molten innovation," did not go to the nature, characteristics, or qualities of basketballs, but instead related to authorship of the technology. 556 F.3d at 1305. Similarly, any advertising or promotional claim by Yale or Buhimschi that attributed the research to a "Yale team" or "Yale researchers" appears to be related

- 12 -

to authorship, rather than the nature, characteristics, or qualities of the research. Further, Romero's claim in this case does not fit within the Supreme Court's dicta in *Dastar*, which left open the possibility for claims to be brought under § 43(a)(1)(B). Instead, comparing Romero's pleadings with the allegations in *Dastar*, Romero's claim closely tracks the claims made in that case. We therefore hold that the district court properly dismissed the Lanham Act claim.

**IV.**

We now turn to Romero's state-law claims, alleging breach of contract and defamation. This court reviews a district court's grant of summary judgment de novo. *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 264 (6th Cir. 2010). "Summary judgment is appropriate when 'the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact' regarding any essential element of the non-moving party's case and the moving party is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(c)). A claim lacks a genuine issue of material fact if no reasonable jury could return a verdict in favor of the nonmoving party. *Id.* Michigan substantive law applies to both the contract claim and the defamation claim. *See Gass v. Marriott Hotel Servs.*, 558 F.3d 419, 425 (6th Cir. 2009); *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008).

**A.**

Under Michigan law, consideration is an essential element of any contract. *Yerkovich v. AAA*, 610 N.W.2d 542, 546 (Mich. 2000). The preexisting duty rule states that a contract fails for lack of consideration where the party promises something that he is already legally bound to do. *46th Circuit Trial Court v. County of Crawford*, 719 N.W.2d 553, 568 (Mich. 2006). This rule

applies whether the preexisting duty is based on statute or contract and whether the promise at issue

is a modification to an existing agreement or whether it is a new agreement. *Kassab v. Dennis*, No.

283394, 2009 WL 763433 at \*1 (Mich. Ct. App. Mar. 24, 2009). Michigan courts have applied this

rule to nullify contracts in a variety of contexts. *See, e.g.*, *46th Circuit Trial Court*, 719 N.W.2d at

568 (finding no contract for county to provide a certain amount of funding to a court where the

constitution required the county to provide "reasonable and necessary funds"); *Yerkovich*, 610

N.W.2d at 546 (finding subrogation agreement between insured and insurance company lacked

consideration because the insurance company had a preexisting duty under the policy to pay

plaintiff's medical expenses); *Pawlak v. Redox Corp.*, 453 N.W.2d 304, 307 (Mich. App. Ct. 1990)

(per curiam) (finding no contract between city and decedent to transport decedent to hospital because

the city had a statutorily imposed preexisting duty to provide service); *Freiburger v. State of Mich.*

*Dep't of Mental Health*, 409 N.W.2d 821, 822 (Mich. Ct. App. 1987) (finding no contract between

decedent and state-run medical clinic to provide appropriate care because medical clinic had a

statutorily imposed duty to provide services).

In this case, Romero alleges that an implied-in-fact contract existed between himself and

Buhimschi whereby Buhimschi would list Romero as a co-author in exchange for collaboration on

the research. Romero further asserts that Buhimschi breached this contract by publishing the

manuscript in BJOG without including him as a co-author. In granting summary judgment in favor

of Buhimschi, the district court determined that Romero's "entire collaboration with Buhimschi was

within the scope of his [federal] employment." *Romero v. Buhimschi*, No. 2:06-cv-10859, 2009 WL

92226 at \*6 (E.D. Mich. Jan. 14, 2009). Therefore, any contract failed for lack of consideration

because Romero had a preexisting duty to collaborate with Buhimschi. *Id.* at 13. In deposition statements, Romero described his federal job duties as requiring him to mentor faculty and fellows, provide technical direction, review performance, provide advice, develop scientific projects, and draft manuscripts. Romero also explicitly stated that his federal job duties required him to collaborate with Buhimschi. Thus, the district court's conclusion is supported by the record.

Romero nonetheless argues that the district court erred for the following reasons: (1) under Michigan law the preexisting duty must be owed to the promisor and not a third party; (2) the National Institute of Child Health and Human Development expected Romero to enter into an authorship agreement with Buhimschi; and (3) even if no implied-in-fact contract existed, Romero is entitled to specific performance under equity principles. Beginning with Romero's first argument, his contention that the duty must be owed to the promisor is not supported by case law. Romero cites *Yerkovich*, 610 N.W.2d at 546, yet nothing in *Yerkovich* discusses whether the preexisting duty rule applies solely in the context of a promisor-promisee relationship. Romero also cites the *Restatement (Second) of Contracts* § 73, which notes in the comments that "the tendency of the law has been simply to hold that performance of contractual duty can be consideration if the duty is not owed to the promisor." While this section might provide support for Romero's argument, there is no indication that Michigan courts have adopted it. Further, Romero's preexisting duty existed within the context of his federal employment. And both Michigan courts and the Restatement recognize that the performance of a preexisting duty is not consideration when the legal duty is owed by a public official. *See, e.g., 46th Circuit Trial Court*, 719 N.W.2d at 568 (finding no contract for county to provide a certain amount of funding to court where constitution required county to provide

"reasonable and necessary funds"); *Restatement (Second) Contracts* § 73, cmt. b (stating that public duties cannot form legal consideration).

Romero also argues that National Institute of Child Health and Human Development expected him to enter into an authorship agreement with Buhimschi. To support his argument, Romero cites the NIH's Guidelines for the Conduct of Research, which highlights the importance of publishing scientific research and recommends open discussions on authorship. Romero attempts to elevate these guidelines into explicit authority to enter into a contract. However, this argument is unavailing because the document which Romero cites plainly states in the introduction that it "is not meant to codify a set of rules, but rather to elucidate, increase awareness and stimulate discussion . . . ." The advice in these guidelines, recommending that "authorship issues[] be discussed openly," simply does not form a legal basis on which to enforce an implied contract between Romero and Buhimschi, given that Romero had a preexisting duty to collaborate with Buhimschi.

Finally, Romero claims that he is entitled to specific performance under principles of equity or unjust enrichment.[3] Romero did not include this equity theory in his pleadings. Instead, in his response to Buhimschi's motion for summary judgment, Romero requested leave to amend his pleadings to include this theory. Romero then formally filed a motion to amend, which the district court denied in its order granting summary judgment in favor of Buhimschi and Yale. Thus, this issue is technically before us on review from the district court's denial of Romero's motion to amend

---

[3]Romero vaguely labels his claim as one for quasi-contract, without citing any specific Michigan case law. Under Michigan law, claims for implied-in-law contracts are labeled "quantum meruit" or "unjust enrichment." *Daimler-Chrysler Servs. N. Am. v. Summit Nat'l Inc.*, 289 F. App'x 916, 924–25 (6th Cir. 2008).

his complaint. This court reviews a district court's denial of a motion for leave to amend a complaint for an abuse of discretion. *Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008). "A motion to amend a complaint should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile." *Colvin v. Caruso*, 605 F.3d 282, 294 (6th Cir. 2010) (quoting *Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995)). When the district court denies the motion on the basis of futility, we review the decision de novo. *Riverview Health Inst. v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010).

In denying Romero's motion, the district court simply stated that "[b]ecause the Court concludes that there was no consideration to support any contract between the parties, it will not consider . . . Romero's motion." *Romero*, 2009 WL 92226 at *4. The exact basis of this denial is not entirely clear to us. However, it appears to be based on futility, so we review the decision de novo. *See Riverview Health Inst.*, 601 F.3d at 512. To make a case for unjust enrichment, the plaintiff must not only show that the defendant received a benefit but that "the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for [the defendant] to retain it." *Dumas v. Auto Club Ins. Ass'n*, 473 N.W.2d 652, 663 (Mich. 1991) (quoting *Restatement Restitution* § 1, cmt. c). Romero's brief does not contend that it would be *unjust* for Buhimschi to retain the benefit of his collaboration, rather he simply urges the court to allow the amended complaint based on general equity principles. Because Romero has not provided a proper legal basis to reverse the district court's denial, we affirm the district court's decision.

**B.**

Finally, we review the district court's grant of summary judgment in favor of the defendants on the defamation claim. To establish a claim for defamation under Michigan law, a plaintiff must show "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of the special harm (defamation per se) or the existence of special harm caused by the publication." *Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005) (per curiam). Michigan courts have repeatedly recognized that a publication is absolutely privileged if the defamed party invited or consented to the publication. *See, e.g., Hieke v. Guevara*, No. 09-10427-BC, 2010 WL 538300 at *5 (E.D. Mich. Feb. 9 2010); *Ramsey v. Speedway SuperAmerica LLC*, No. 279034, 2008 WL 3541206 at *4–5 (Mich. Ct. App. Aug. 14, 2008); *Leftwich v. Lula Belle Stewart Ctrs.*, No. 270089, 2006 WL 3304190 at *2 (Mich. Ct. App. Nov. 14, 2006) (per curiam); *Jaafar v. Sabon*, No. 229992, 2002 WL 1482605 at *1 (Mich. Ct. App. July 9, 2002) (per curiam); *Med. Planning Consulting v. St. Mary's Med. Ctr.*, No. 214018, 2000 WL 33418859 at *5 (Mich. Ct. App. June 13, 2000) (per curiam); *Hollowell v. Career Decisions, Inc.*, 298 N.W.2d 915, 922 (Mich. Ct. App. 1980); *Merritt v. Detroit Mem. Hosp.*, 265 N.W.2d 124, 127 (Mich. App. Ct. 1978); *Schechet v. Kesten*, 141 N.W.2d 641, 644 (Mich. Ct. App. 1966). The privilege can be both express or implied. *Ramsey*, 2008 WL 3541206 at *4 (quoting 50 *Am. Jur. 2d Libel & Slander* § 254). An absolutely privileged communication is not subject to a defamation claim even if the statement was false or malicious. *Oesterle v. Wallace*, 725 N.W.2d 470, 474 (Mich. Ct. App. 2006).

A Michigan appellate court has recognized the absolute privilege of consent in a case where the plaintiff's attorney sent a letter to the defendant threatening to file suit for breach of contract and requesting a response. *Med. Planning Consulting*, 2000 WL 33418859 at *2. The Michigan Court of Appeals determined that the plaintiff had invited the defamatory statements by sending the letter. *Id.* at *4–5. Both Michigan and federal courts have also applied the privilege of consent where defamatory publications were sent as part of a review or investigatory process. *See Heike*, 2010 WL 538300 at *5 (holding that plaintiff impliedly consented to defamation where defendant made statements to a school's appeals committee as part of an investigation into whether the defendant-coach harassed the plaintiff-player); *Schechet*, 141 N.W.2d at 644 (holding that the privilege of consent applied to letters sent to a credentials committee at a hospital where the letters were sent as part of the hospital's review process for staff privileges).

In this case, Romero bases his defamation claim on three publications: (1) Buhimschi's republication to BJOG and Yale of her appeal letter originally sent to the Wayne State University investigative committee; (2) Buhimschi's republication to a deputy general counsel at Yale of Carl Weiner's emails to BJOG urging the journal to publish Buhimschi's manuscript; and (3) Lawrence Cohen's letter to members of the Yale ad hoc committee outlining the committee's duties. The district court determined that Romero invited, and thus consented to, the defamations by invoking Wayne State's investigative proceedings, by prompting Wayne State to notify BJOG of the authorship dispute, and by having a role in Yale forming its ad hoc committee to investigate the Wayne State findings.

A reading of the allegedly defamatory publications shows that the privilege of consent applies to Romero's defamation claim. Beginning with the first publication, consisting of Buhimschi's republication of her appeal letter to BJOG and Yale, Romero's own deposition testimony indicates that he urged Wayne State officials to contact BJOG about the authorship dispute. By prompting this contact with BJOG, Romero impliedly consented to Buhimschi's defense of her manuscript. *See Schechet*, 141 N.W.2d at 644. Moving to the second and third publications, both of these were sent in the context of Yale's investigation, after that school learned of the findings by the Wayne State committee. In his brief, Romero admits that Wayne State officials notified Yale of its scientific misconduct findings, as was required by Wayne State policy, and that Yale appointed its own investigative committee after the investigation at Wayne State was complete. Further, Romero's own deposition testimony indicates that he initiated the investigatory proceedings at Wayne State University, which culminated in the findings being reported to Yale. Romero therefore impliedly consented to Buhimschi's response to Yale officials. *See Schechet*, 141 N.W.2d at 644.

Romero nevertheless argues that the publications were not absolutely privileged under Michigan law because the Michigan Supreme Court has not recognized consent as an absolute privilege. He relies on *Smutherwaite v. News Pub. Co.*, 83 N.W. 116 (Mich. 1900), to support his position. In *Smutherwaite*, the Michigan Supreme Court specifically recognized a privilege of "self-defense," which arises when a defendant answers charges against him. 83 N.W. at 119. The court found error in the trial court's jury instructions on this issue because the instruction did not limit the privilege based on malice and did not limit the privilege based on whether the statement was related

- 20 -

to the charges. *Id.* While *Smutherwaite* might appear at first blush to provide support for Romero's

position, a careful reading of the case shows that it does not.

To begin with, *Smutherwaite* does not appear to be addressing the same privilege asserted

by Buhimschi and Yale in this case. While the trial court's instructions in *Smutherwaite* used the

term "consent," the Michigan Supreme Court's decision discusses the privilege as being one of "self

defense." 83 N.W. at 119. It also describes the privilege as applying where "the occasion is one

which justifies such publication," and states that defendants have a "qualified privilege" to respond

to accusations. *Id.* Given that the case was published in 1900, the exact privilege at issue is difficult

to ascertain. However, a careful reading of the opinion leads us to conclude that the *Smutherwaite*

court addressed a qualified occasional privilege, rather than the privilege of consent.

Under the section on conditional privileges, the Restatement of Torts lists "occasions making

a publication conditionally privileged" and further lists "protection of the publisher's interest" as a

conditional privilege. *Restatement (Second) of Torts* § 594. A communication falls under this

qualified occasional privilege if the circumstances surrounding the communication are such that a

reasonable belief exists that the communication "affects a sufficiently important interest of the

publisher" and "the recipient's knowledge of the defamatory matter will be of service in the lawful

protection of this interest." *Id.* This occasional privilege is separate and distinct from the privilege

of consent. Because the *Smutherwaite* court described the privilege as being one of "self defense"

and used the words "occasion" and "qualified" in its analysis, we believe that the case addresses the

qualified occasional privilege of protecting the publisher's interest, rather than the privilege of

consent. Our reading of *Smutherwaite* is bolstered by the Michigan appellate courts' treatment of the privilege of consent.

While it is admittedly unclear whether the Michigan Supreme Court has addressed the privilege of consent, Michigan appellate courts have clearly and consistently recognized that an invited or consented to communication is privileged.[4] Though the precedential value of these cases is somewhat weakened by their age or unpublished status, we find these cases difficult to ignore given their numbers. We also find it difficult to ignore these cases' explicit description of the privilege as being "absolute." *See, e.g.*, *Heike*, 2010 WL 538300 at *5 (citing *Restatement (Second) of Torts* § 583); *Leftwich*, 2006 WL 3304190 at *2 ("A communication regarding a person is absolutely privileged if the person consents to the communication."); *Jafar*, 2002 WL 1482605 at *1 ("A communication regarding a person is absolutely privileged if the person who is the subject of the communication consented to it."); *Med. Planning Consulting*, 2000 WL 33418859 at *5 ("A communication regarding a person is absolutely privileged if the person consents to the communication."); *Hollowell*, 298 N.W.2d at 922 ("A communication regarding a person is absolutely privileged if it is consented to."); *Merritt*, 265 N.W.2d at 127 ("A communication regarding a person is absolutely privileged if he consents to it."); *Schechet*, 141 N.W.2d at 644 ("[T]he publication of false and defamatory matter of another is absolutely privileged if the other consents thereto."). Finally, we find it difficult to ignore the factual similarities between these cases

---

[4]*See, e.g., Hieke*, 2010 WL 538300 at *5; *Ramsey*, 2008 WL 3541206 at *4–5; *Leftwich*, 2006 WL 3304190 at *2; *Jaafar*, 2002 WL 1482605 at *1; *Med. Planning Consulting*, 2000 WL 33418859 at *5; *Hollowell*, 298 N.W.2d at 922; *Merritt*, 265 N.W.2d at127; *Schechet*, 141 N.W.2d at 644.

and Romero's case. Because this is the body of case law on which Yale and Buhimschi rely, we find it controlling.

Moreover, none of the Michigan appellate court decisions listed above cites *Smutherwaite*, which further supports our conclusion that *Smutherwaite* did not address the privilege of consent but instead addressed a qualified occasional privilege.[5] And if we were to reverse the district court under the auspices of *Smutherwaite*, we would be ignoring this large body of Michigan case law that recognizes an absolute privilege of consent. We would further be implying that all of these Michigan appellate cases were wrongly decided under *Smutherwaite*. Notwithstanding this large body of Michigan appellate court decisions, Romero makes persuasive arguments as to how he believes the Michigan Supreme Court would evaluate the privilege of consent. However, his arguments are nothing more than his own speculations. And we should look to the decisions of the intermediate appellate courts unless we are convinced that the state supreme court would decide the issue differently. *Mike's Train House, Inc. v. Lionell, LLC*, 472 F.3d 398, 413 (6th Cir. 2006). We therefore find the decisions of the Michigan appellate courts, recognizing an absolute privilege of consent, controlling in this case.

Additionally, we believe that it would be problematic to rely on *Smutherwaite* given its age and developments that have occurred in defamation law since the decision. *Smutherwaite* involved defamatory statements published in a newspaper in the context of an election. 83 N.W. at 117. The

---

[5]In *Merritt*, the Michigan appellate court applied a qualified occasional privilege to some of the defendants' defamatory publications and applied an absolute consent privilege to other publications. 265 N.W.2d at 127. This opinion, therefore, indicates that these are in fact separate privileges under Michigan law.

case was decided long before the Supreme Court's seminal decision in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). While *Smutherwaite*'s analysis on common-law privileges might remain good law, the holding is questionable under *Sullivan*. Its precedential value is therefore dubious. Further, we note that *Smutherwaite* has only been cited five times in its 110-year history, four of which occurred prior to 1916. We therefore do not believe that it controls the outcome of this case.

Romero offers one final argument in support of his position. He argues that even if the privilege of consent is absolute under Michigan law, the defendants in the present case exceeded the scope of any consent. Michigan courts have noted that the consent privilege applies to those statements relevant to the purpose for which consent was given and to those persons with a legitimate interest in their content. *Ramsey*, 2008 WL 3541206 at * 4 (quoting 50 *Am. Jur. 2d Libel & Slander* § 254). It is clear that Buhimschi, as well as the parties to which she published the statements, had a legitimate interest in the content of the statements. Further, it is also clear from Romero's pleadings and a reading of the statements themselves that all of the allegedly defamatory statements were relevant to the purpose for which the consent was given. Specifically, all of the statements concerned Buhimschi's reasons for originally including Romero as a co-author, her reasons for removing Romero as a co-author, her views on Wayne State's investigatory process, and her version of Romero's contributions to the research. While Romero might dispute the veracity of these statements, absolute privileges apply regardless of whether the statements are false or malicious. *Oesterle*, 725 N.W.2d at 474. We therefore hold that defamatory statements are privileged under Michigan law.

**V.**

For the foregoing reasons, we AFFIRM the district court's dismissal of the Lanham Act claim and grant of summary judgment in favor of the defendants on the contract and defamation claims. We also DENY Romero's motion to expand the record on appeal.